**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

BARRY W. ROPER,                          )
                                         )
      Plaintiff(s),                      )
                                         )
      vs.                                )          Case No. 1:20 CV 112 SRW
                                         )
ANDREW M. SAUL,                          )
Commissioner of Social Security          )
Administration,                          )
                                         )
      Defendant(s).                      )

**MEMORANDUM AND ORDER**

This matter is before the Court on review of an adverse ruling by the Social Security

Administration. The Court has jurisdiction over the subject matter of this action under 42 U.S.C.

§ 405(g). The parties have consented to the exercise of authority by the United States Magistrate

Judge pursuant to 28 U.S.C. § 636(c). Plaintiff filed a Brief in support of the Complaint. ECF

No. 23. Defendant filed a Brief in Support of the Answer. ECF No. 28. The Court has reviewed

the parties' briefs and the entire administrative record, including the transcripts and medical

evidence. Based on the following, the Court will affirm the Commissioner's decision.

I.      **Factual and Procedural Background**

On May 19, 2017, Plaintiff Barry W. Roper protectively filed an application for disability

insurance benefits (DIB) under Title II, 42 U.S.C. §§ 401, *et seq*. and supplemental security

income (SSI) under Title XVI, 42 U.S.C. §§ 1381, *et seq.*[1] Tr. 190-91, 265-77. Plaintiff alleged

an onset date of February 25, 2014. Tr. 265. Plaintiff's application was denied on initial

---

[1] The record reflects that Plaintiff previously filed for DIB and SSI on April 7, 2014, with an alleged onset date of February 18, 2014. Tr. 142-52, 164. On March 2, 2016, an ALJ determined Plaintiff to be not disabled after he was denied on initial review. Tr. 475-52, 157-62.

consideration, and he requested a hearing before an Administrative Law Judge ("ALJ"). Tr. 163-91, 196-03, 204-05.

Plaintiff and counsel appeared for a hearing on December 17, 2018. Tr. 32-72. Plaintiff testified concerning his disability, daily activities, functional limitations, and past work. *Id*. The ALJ also received testimony from vocational expert ("VE") Deborah A. Determan, M.S.[2] *Id*. On the same date as the hearing, Plaintiff amended his alleged onset date from February 25, 2014 to May 15, 2016. Tr. 301.

On May 2, 2019, the ALJ issued an unfavorable decision finding Plaintiff not disabled. Tr. 8-30. Plaintiff filed a request for review of the ALJ's decision with the Appeals Council. On March 23, 2020, the Appeals Council denied Plaintiff's request for review. Tr. 1-7. Accordingly, the ALJ's decision stands as the Commissioner's final decision.

With regard to Plaintiff's testimony, medical records, and work history, the Court accepts the facts as presented in the parties' respective statements of facts and responses. The Court will discuss specific facts relevant to the parties' arguments as needed in the discussion below.

## II.    Legal Standard

A disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A claimant has a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in

---

[2] The hearing transcript identifies the VE as "Deborah Gatterman;" however, her resume identifies her as "Deborah A. Determan." Tr. 32, 400-02.

any other kind of substantial gainful work which exists in the national economy[.]" §
1382c(a)(3)(B).

The Commissioner follows a five-step sequential process when evaluating whether the
claimant has a disability. 20 C.F.R. § 416.920(a)(1). First, the Commissioner considers the
claimant's work activity. If the claimant is engaged in substantial gainful activity, the claimant is
not disabled. 20 C.F.R. § 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner
looks to see whether "the claimant has a severe impairment [that] significantly limits claimant's
physical or mental ability to do basic work activities." *Hurd v. Astrue*, 621 F.3d 734, 738 (8th
Cir. 2010); *see also* 20 C.F.R. § 416.920(a)(4)(ii). "An impairment is not severe if it amounts
only to a slight abnormality that would not significantly limit the claimant's physical or mental
ability to do basic work activities." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *see also*
20 C.F.R. §§ 416.920(c), 416.920a(d).

Third, if the claimant has a severe impairment, the Commissioner considers the
impairment's medical severity. If the impairment meets or equals one of the presumptively
disabling impairments listed in the regulations, the claimant is considered disabled, regardless of
age, education, and work experience. 20 C.F.R. §§ 416.920(a)(4)(iii), (d).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the
presumptively disabling impairments, the Commissioner assesses whether the claimant retains
the "residual functional capacity" ("RFC") to perform his or her past relevant work. 20 C.F.R. §§
416.920(a)(4)(iv), 416.945(a)(5)(i). An RFC is "defined as the most a claimant can still do
despite his or her physical or mental limitations." *Martise v. Astrue*, 641 F.3d 909, 923 (8th Cir.
2011); *see also* 20 C.F.R. § 416.945(a)(1). While an RFC must be based "on all relevant

3

evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations," an RFC is nonetheless an "administrative assessment"—not a medical assessment—and therefore "it is the responsibility of the ALJ, not a physician, to determine a claimant's RFC." *Boyd v. Colvin*, 831 F.3d 1015, 1020 (8th Cir. 2016). Thus, "there is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016). Ultimately, the claimant is responsible for *providing* evidence relating to his RFC, and the Commissioner is responsible for *developing* the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 416.945(a)(3). If, upon the findings of the ALJ, it is determined the claimant retains the RFC to perform past relevant work, he or she is not disabled. 20 C.F.R. § 416.920(a)(4)(iv).

Fifth, if the claimant's RFC does not allow the claimant to perform past relevant work, the burden of production to show the claimant maintains the RFC to perform work which exists in significant numbers in the national economy shifts to the Commissioner. *See Brock v. Astrue*, 574 F.3d 1062, 1064 (8th Cir. 2012); 20 C.F.R. § 416.920(a)(4)(v). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, the Commissioner finds the claimant not disabled. 20 C.F.R. § 416.920(a)(4)(v). If the claimant cannot make an adjustment to other work, the Commissioner finds the claimant disabled. *Id.* At Step Five, even though the *burden of production* shifts to the Commissioner, the *burden of persuasion* to prove disability remains on the claimant. *Hensley*, 829 F.3d at 932.

If substantial evidence on the record as a whole supports the Commissioner's decision, the Court must affirm the decision. 42 U.S.C. §§ 405(g); 1383(c)(3). Substantial evidence is

"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "[T]he threshold for such evidentiary sufficiency is not high." *Id*. Under this test, the court "consider[s] all evidence in the record, whether it supports or detracts from the ALJ's decision." *Reece v. Colvin*, 834 F.3d 904, 908 (8th Cir. 2016). The Court "do[es] not reweigh the evidence presented to the ALJ" and will "defer to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence." *Id*. The ALJ will not be "reverse[d] merely because substantial evidence also exists in the record that would have supported a contrary outcome, or because [the court] would have decided the case differently." *KKC ex rel. Stoner v. Colvin*, 818 F.3d 364, 370 (8th Cir. 2016).

## III.    The ALJ's Decision

Plaintiff previously worked as a truck driver and mechanic; however, the ALJ found he has not engaged in substantial gainful activity since the amended alleged onset date of May 15, 2016. Tr. 13. Plaintiff has the severe impairments of "obesity; rheumatoid arthritis; carpal tunnel syndrome; polyneuropathy; and chronic obstructive pulmonary disease." Tr. 14-15. Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. Tr. 15-16. The ALJ found Plaintiff had the following RFC:

> [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the [Plaintiff] can occasionally push or pull with the right lower extremity; should never climb ladders, ropes, and scaffolds; and could occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl. The [Plaintiff] should have no more than occasional exposure to vibration and occasional exposure [to] dusts, fumes, odors, gases, poor ventilation, other pulmonary irritants, or hazards, such as unprotected heights. Further, the claimant can occasionally handle, finger, and feel bilaterally.

Tr. 16-22. The ALJ found Plaintiff was unable to perform his past relevant work. Tr. 22. The

ALJ further found Plaintiff was born on May 16, 1966, has at least a high school education, and

is able to communicate in English. *Id*. The ALJ determined the transferability of job skills was

not material to the determination of disability because, using the Medical-Vocational Rules as a

framework, it supported a finding that the claimant was "not disabled," whether or not the

claimant had transferable job skills. *Id*. Relying on the testimony of the VE and considering

Plaintiff's age, education, work experience and RFC, the ALJ found that there were jobs existing

in significant numbers in the national economy which the Plaintiff could perform, including

representative occupations such as Furniture Clerk (*Dictionary of Occupational Titles* ("*DOT*")

No. 295.357-018); Tanning Salon Attendant (*DOT* No. 359.567-014); and Counter Clerk (*DOT*

No. 249.366-010). Tr. 22-23. The ALJ concluded Plaintiff was not under a disability from

February 25, 2014, through the date of her decision on May 2, 2019. Tr. 23.

## IV.    Discussion

Plaintiff challenges the ALJ's decision on one ground. He argues there is not substantial

evidence in the record to support his ability to perform light work as determined by the ALJ.

ECF No. 23, at 13-14. Plaintiff first points to the fact that he was prescribed Methotrexate for

rheumatoid arthritis which he claims was ineffective and "caused nausea and vomiting that

would sometimes go on for days." *Id.* at 11-12. Plaintiff then refers to his earnings record

showing he made $59,710 in 2011, $29,504 in 2012, and $42,905 in 2013, and he cites to his

testimony that he enjoyed working. *Id.* at 12. Plaintiff asks, "Why would he stop work? The only

sensible answer is that he could not do it anymore." *Id*. Next, Plaintiff cites to a May 5, 2017

neurosurgical consult with Dr. Joel West Ray, M.D., in which the progress note indicates he had

"some neck pain" and "some low back pain," but it was not of "great significance to [Plaintiff]."

*Id.* at 13, 31; Tr. 737. Plaintiff appears to argue that this note evidences his inability to maintain employment because although he had neck and low back pain "it was not even important to him because of the overwhelming difficulties he was having with other parts of his body." *Id.* at 13. Lastly, Plaintiff argues he cannot perform light work because he unable to stand for long periods of time and has poor manual dexterity. *Id.* at 13-14.

In response, the Commissioner takes issue with the brevity and unsupported nature of Plaintiff's "'cursory and summary statement' of the asserted error." ECF No. 28, at 4 (quoting *Sidebottom v. Delo*, 46 F.3d 744, 750 (8th Cir. 1995)). The Commissioner points out that Plaintiff only cites to five pages of his approximately 1,300-page medical record and, therefore, has not met his burden to show prejudicial error. *Id.* The Commissioner also argues that Plaintiff failed to acknowledge his significant improvement with conservative treatment and medication, numerous physical and consultative examinations which reflected non-disabling findings, and his ability to perform a range of daily activities. *Id.* at 5-8. Thus, the Commissioner argues the ALJ's decision was supported by substantial evidence.

The ALJ determined Plaintiff had the RFC to perform light work with additional limitations. Tr. 16-22. As the Court will summarize below, the ALJ provided a detailed review of Plaintiff's hearing testimony, relevant objective medical evidence, and Plaintiff's daily activities. Tr. 15-22. The ALJ appropriately considered the evidence in the rather voluminous administrative record, including hundreds of pages of treatment notes from various treating medical providers. Thus, the Court finds the ALJ's decision is based on substantial evidence in the record as a whole and is consistent with the Social Security Administration Regulations and case law.

The "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." SSR 96-8p, 1996 WL 374184 (July 2, 1996). "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (quotation and citation omitted). "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007). Nonetheless, there is no requirement that an RFC finding be supported by a specific medical opinion. *Hensley*, 829 F.3d at 932.

Additionally, an ALJ is not limited to considering only medical evidence in evaluating RFC. *Cox*, 495 F.3d at 619; *see also Dykes v. Apfel*, 223 F.3d 865, 866 (8th Cir. 2000) (per curiam) ("To the extent [plaintiff] is arguing that residual functional capacity may be proved only by medical evidence, we disagree."). The ALJ may consider a plaintiff's daily activities, subjective allegations, and any other evidence of record when developing the RFC. *Hartmann v. Berryhill*, No. 4:17-CV-002413-SPM, 2018 WL 4679737, at *6 (E.D. Mo. Sept. 28, 2018) (citing *Cox*, 495 F.3d at 619-20). Although the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner. *Cox*, 495 F.3d at 620; 20 C.F.R. §§ 416.927(e)(2), 416.946.

Plaintiff bears the burden of proving his RFC. *See Moore*, 572 F.3d at 523. Ultimately, the plaintiff is responsible for providing evidence relating to his RFC, and the Commissioner is responsible for developing the plaintiff's "complete medical history, including arranging for a

consultative examination(s) if necessary, and making every reasonable effort to help [the plaintiff] get medical reports from [the plaintiff's] own medical sources." *Turner v. Saul*, No. 4:18-CV-1230-ACL, 2019 WL 4260323, at *8 (E.D. Mo. Sept. 9, 2019) (quoting 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3)).

In determining Plaintiff's RFC, the ALJ first considered Plaintiff's hearing testimony in which he described his symptoms of rheumatoid arthritis, neuropathy, and shortness of breath. Tr. 17, 42-45. Plaintiff testified he was prescribed Methotrexate for almost three years which caused "brutal" side effects and did not alleviate his arthritic symptoms. Tr. 17. 43. He described a "big improvement" after he was instructed to discontinue Methotrexate. Tr. 17, 42-44. Plaintiff stated his rheumatoid arthritis was "much more manageable" with Enbrel, although he continues to experience flare ups and has some side effects, including sores on his tongue, dry mouth, and fatigue. Tr. 17, 44, 53-55, 63. Plaintiff testified he also receives joint injections about every three months, which "eases the pain." Tr. 17, 47-48.

Plaintiff discussed his 2017 carpel tunnel surgery and stated he experienced subsequent left arm improvement but could not participate in physical therapy because it triggered flare ups. Tr. 17, 45. Plaintiff reported experiencing a "sticky finger" in his right hand but declined surgery, although it was recommended in June of 2017. Tr. 17, 45-46. Plaintiff testified he has problems dropping things "all of the time." Tr. 17, 59. As to his COPD, Plaintiff stated he uses a rescue inhaler once per day but continues to smoke half of a pack of cigarettes daily. Tr. 48-49.

Plaintiff testified he has difficulties ascending steps, an inability to stand for more than five minutes before experiencing neuropathy or numbness in his legs, and an inability to walk more than fifty feet due to shortness of breath. Tr. 17, 44, 46-47, 53-55, 57-58. Plaintiff also stated he has lived alone for five years, operates a vehicle at least two times per week, is able to

do his own laundry, and can grocery shop. Tr. 51-52. Plaintiff stated his brother's ex-wife cleans his home every other week, and his brother assists him in shopping for heavier items. Tr. 17, 51-52, 56.

In making the RFC determination, the ALJ found Plaintiff's "allegations regarding the severity of his symptoms [were] inconsistent with the objective medical evidence of record." Tr. 18. The ALJ first discussed Plaintiff's rheumatoid arthritis, which included symptoms of acute flare ups, joint stiffness, and pain. The ALJ cited a September 2, 2016 record from Saint Francis Medical Center in which Plaintiff presented with complaints of joint stiffness for about 30 minutes in the morning, recent onset of left shoulder pain, and some tingling in his left hand. Tr. 18, 1687. At the time of that appointment, Plaintiff was taking Methotrexate and Hydroxychloroquine and was compliant with his treatment. *Id.* The physical examination revealed grossly normal tone and muscle strength, pain with elevation and external rotation of the left shoulder, and no signs of synovitis. Tr. 1688. Plaintiff received a left shoulder Kenalog injection and was told to resume taking folic acid. Tr. 18, 1689. On September 11, 2016, Plaintiff was admitted to the Emergency Room for nausea and vomiting. Tr. 18, 1690-92. He was instructed to discontinue Methotrexate and begin Arava. *Id.* On September 20, 2016, Plaintiff reported feeling better since he stopped taking Methotrexate and denied nausea or vomiting. Tr. 1690.

The ALJ found Plaintiff's rheumatoid arthritis to have improved after September 2016. Tr. 18. The ALJ pointed to a November 1, 2016 record from Saint Francis Medical Center which documented Plaintiff's report to Dr. Amjad Roumany, M.D., of "feeling better with less pain and swelling" after switching to Arava. Tr. 18, 1693. During that visit, Plaintiff limited his complaints to joint stiffness for about 5 minutes in the morning and denied any symptoms or side

effects of his medications. *Id.* A joint examination of the upper and lower extremities showed no

signs of synovitis or pain, and the range of motion was normal. Tr. 1694.

On May 17, 2017, Plaintiff presented to Dr. Nivedita Nagam, M.D., at Missouri Delta

Physician Services for a second opinion regarding the rheumatoid arthritis in his left wrist. Tr.

18, 847-852, 1121-26. Plaintiff described his discomfort as "achy and dull" with "swelling," but

explained his symptoms were "improving" and "intermittent." Tr. 847. Plaintiff believed the

discomfort was aggravated by activity, but that steroid shots in his joints helped. *Id.* Upon

examination, Plaintiff's joints were described as "non-tender without significant inflammation"

with limited left shoulder range of motion, normal upper extremity strength, mild rheumatoid

arthritis changes, and no edema. Tr. 849. Plaintiff was advised to take pain medication so he

could begin physical therapy. Tr. 18, 849-50.

The ALJ noted on June 30, 2017, Plaintiff complained of a "moderate-severe" arthritis

flare-up in his right knee. Tr. 18, 1131-35. Plaintiff reported the pain to be worsening and

aggravated by "activity, standing, walking, arising from a chair and cold or rainy weather." Tr.

1131. A physical examination revealed right knee swelling, tenderness, and significant synovitis.

Tr. 18, 1133. Plaintiff was given a prednisone taper, a prescription for sulfasalazine, and

instructed to follow up in six weeks. Tr. 18, 1133-34. At the follow up appointment on August

11, 2017, Plaintiff reported improvement in his right knee, but complained of joint pain,

swelling, and morning stiffness in his left knee. Tr. 18, 1136, 1139. Upon examination, Dr.

Nagam found mild synovitis in the left knee and tenderness in the right foot/ankle, and the right

shoulder showed moderate pain with motion. Tr. 1137. The right knee showed tenderness and

moderate pain with motion. *Id.* Plaintiff was given a Kenalog injection for left knee pain, a

prednisone taper, and an increased dose of sulfasalazine. Tr. 1138. A September 26, 2017 follow

up appointment evidenced overall improvement as his physical exam indicated only mild shoulder and knee pain with "no significant synovitis, [and] good range of motion in all joints." Tr. 18, 1142. Plaintiff indicated he was "doing well without an acute flare recently." Tr. 1143. Plaintiff was told to discontinue sulfasalazine due to his reports of alternating diarrhea and constipation. Tr. 18, 1143.

The ALJ then cited an August 7, 2017 consultative examination with Dr. Barry Burchett, M.D. Tr. 18-19, 1025-30. Dr. Burchett observed that Plaintiff ambulated with a normal gait without the use of an ambulation device; appeared stable and comfortable in the supine and sitting positions; had clear lung fields with no shortness of breath; exhibited a regular heart rate; was moderately obese; had non-tender shoulders, elbows, and wrists; was able to fully extend hands and make a fist; could write and pick up a coin with either hand; had full range of motion in the joints of fingers; and no tenderness or swelling in the lower extremities, including the knees, ankles, feet, and calves. Tr. 1027-28. Dr. Burchett noted Plaintiff had "mild swelling of the dorsum of the right foot," "mild limitation of range of motion of the right shoulder and right hip," "full range of motion of all other joints," "no deformities of any joints," "no acute inflammation in any joints other than the right foot," and "no shortness of breath with the examination." Tr. 1028.

The ALJ then considered Plaintiff's continuous improvement. Tr. 19. Specifically, on October 23, 2017, Plaintiff reported to Dr. Nagam that he was "doing well without an acute flare." Tr. 19, 1152. Dr. Nagam's musculoskeletal examination found "normal range of motion, normal strength, [and] no swelling." Tr. 19, 1151. Plaintiff did not experience another flare up until February 2018 in which he reported only needing to take Prednisone once since November 2017. Tr. 19, 1159-63. A February 5, 2018 examination exhibited "normal range of motion,

normal strength, [and] mild synovitis/tenderness in the [left] knee." Tr. 1161. He was given a

Kenalog injection in his left knee and advised to avoid strenuous activity for two to three days.

Tr. 19, 1162. On March 19, 2018, Plaintiff confirmed the Kenalog injections provided "good

symptomatic relief," and Dr. Nagam described his condition as "stable." Tr. 1167. On June 25,

2018, Dr. Nagam indicated he was tolerating his medications well "with on and off nausea/GI

symptoms with Arava." Tr. 19, 1169.

After summarizing Plaintiff's treatment for rheumatoid arthritis, the ALJ next discussed

Plaintiff's carpal tunnel syndrome, which developed in March of 2017 with an onset of left hand

and wrist pain. Tr. 19, 1699. On March 31, 2017, Plaintiff underwent a joint examination by

rheumatologist Dr. Amjad Roumany, M.D., who found synovitis in his left wrist, as well as pain

and mild synovitis in his left fourth and fifth proximal interphalangeal joints. Plaintiff had a

normal range of motion. Tr. 19, 1700. Plaintiff was given a Kenalog injection in his left wrist

and placed on a tapering dose of steroids. Tr. 1701-02. On April 7, 2017, Plaintiff appeared to

the emergency department at Saint Francis Medical Center for pain and swelling in his left hand.

Tr. 19, 611. Notably, Plaintiff described all other arthritic joint pain "to be under control." Tr.

614-15. After obtaining an X-ray of his left wrist, he was scheduled for carpal tunnel release

surgery. Tr. 19, 617.

A CT scan of Plaintiff's left hand was performed on April 17, 2017 which revealed

"[p]ossible synovitis of the common flexor tendon sheath," "[n]o rim enhancing fluid collections

or subcutaneous fluid collections, [n]o deep mild fascial enhancement," and "[n]o fracture,

subluxation, or radiopaque foreign bodies." Tr. 19, 594-95. On April 28, 2017, Plaintiff

presented to Dr. Roumany for a follow up appointment. Tr. 1702-05. Treatment notes indicate

Plaintiff was "recovering well" from the surgery with "no pain" and only "some swelling in the

13

left wrist." Tr. 1702. Plaintiff reported "joint stiffness for about 60 minute(s) in the morning." *Id.*

On June 5, 2017, Plaintiff was described to have "[m]ild erythema and swelling over the healing

surgical scar over the left wrist" with swelling improvement after a Prednisone taper. Tr. 19-20,

1128-29, 1131. One year later, on September 13, 2018, Plaintiff was described "to have some

Tinel sign at the wrist but has preserved muscle bulk in the thenar eminence with normal hand

function." Tr. 20, 1480. Plaintiff was also reported to have "5/5 strength in all four extremities"

and "normal overall tone." *Id.*

The ALJ next considered Plaintiff's neurological issues. The ALJ referenced a May 15,

2017 consultation with Dr. Joel West Ray, M.D., for complaints of numbness in his hands, feet,

and right anterior lateral thigh. Tr. 20, 750-55. Dr. Ray found "[r]esistant motor testing is

difficult to assess in the left hand but otherwise seems 5/5." Tr. 20, 755. He also noted light

touch revealed spotty minor numbness around his thigh. *Id.* On July 10, 2017, Plaintiff appeared

to Dr. Randall Stahly, D.O., for numbness and tingling of the feet. Tr. 20, 1436-47. An EMG

nerve conduction study revealed "demyelinating symmetric polyneuropathy" which was "most

likely reflective of his rheumatoid arthritis syndrome." Tr. 1447. Dr. Stahly noted, however, that

his symptoms were "improving with his present autoimmune regimen." *Id.* Dr. Stahly further

indicated Plaintiff had "right-sided meralgia paresthetica with chronic cubital and carpal tunnel

symptoms," which he was treating conservatively. *Id.* Plaintiff did not have significant

neurogenic pain, but he did have some numbness in his feet. This was exacerbated when Plaintiff

stands, "but he feels that he can control this." *Id.* He had no issues falling asleep in the night. *Id.*

His examination revealed "Phalen and Tinel signs at the wrist," "mildly diminished vibratory

perception," and an unremarkable gait and balance. *Id.* Dr. Stahly encouraged Plaintiff to lose

15-20 pounds for treatment. *Id.*

On August 17, 2018, Plaintiff appeared for a follow up appointment with Dr. Stahly. At that appointment he also complained of a recent onset of daytime sleepiness with cognitive decline. Tr. 20, 1460-66. Plaintiff reported, however, that he felt as if his neuropathy and nerve entrapment symptoms were "stable." Tr. 20, 1462. Upon a physical examination, Plaintiff exhibited fluent speech, 5/5 strength in all four extremities, normal overall tone, diminished ankle jerks with downgoing plantar response, negative Romberg sign, fade to temperature and pinprick in a stocking distribution of the lower extremities with diminished vibratory perception, and normal gate and stance. Tr. 20, 1461. Plaintiff was prescribed Gabapentin. At a follow up appointment on September 13, 2018, he reported his neurogenic issues to be "markedly improved" with medication. Tr. 20, 1480. Plaintiff later reported some mild left leg swelling as a side effect of the Gabapentin. Tr. 20, 1659.

The ALJ then considered Plaintiff's COPD. Tr. 20. On July 19, 2016, Plaintiff appeared to Dr. Husam Najjar, M.D., at the Missouri Delta Physicians Services for an initial evaluation of pleural effusion and a moderately severe cough. Tr. 20, 577-81. A respiratory examination revealed decreased breath sounds and wheezing. *Id.* Plaintiff reported he was a smoker, and Dr. Najjar advised him to quit immediately. Tr. 580. On July 25, 2016, Plaintiff underwent a pulmonary function test, which revealed moderate obstructive airways disease, moderate restriction, and moderate diffusion defect. Tr. 840. The following day, Plaintiff reported to Dr. Najjar that his symptoms improved with Spiriva, and his cough was minimal. Tr. 20, 572. Dr. Najjar described his pleural effusion as "very small with no loculation" and again instructed plaintiff to quit smoking. Tr. 574-75. On October 26, 2016, Plaintiff appeared for a follow up appointment with Dr. Najjar. Tr. 567-71. Treatment notes indicated his COPD symptoms to be

"stable on Spiriva" with a "much better/resolved" cough despite his continued smoking. Tr. 20, 567, 569-70.

On June 13, 2017, Plaintiff underwent a chest/thorax CT scan. Tr. 21, 1003-04. The impression revealed the "internal resolution of left pleural effusion," two "unchanged" nodules in the left lung, and "patchy areas of air trapping in the mid to lower lungs with moderate severity." *Id.* On June 27, 2017, Plaintiff appeared for a follow up appointment with Dr. Najjar. Tr. 1011-15. The treatment notes indicate he had "mildly severe" symptoms of "dyspnea on exertion and productive cough." *Id*. Dr. Najjar described Plaintiff's COPD as "stable" with "[n]o major exacerbation." *Id*. He was ordered to continue his current inhalers, including Spiriva, without change. Tr. 1014. Notably, in one section of the treatment notes, Dr. Najjar reported that Plaintiff quit smoking, while in another section he described Plaintiff as a current smoker. Tr. 1012, 1014. Pulmonary function tests on June 29, 2017 and August 7, 2017 revealed mild restrictive pulmonary disease. Tr. 21, 1018, 1032.

The ALJ noted that one year later, on June 7, 2018, Plaintiff appeared for a six-month COPD follow up with Dr. Najjar. Tr. 1115-17. Dr. Najjar wrote that Plaintiff "continues to smoke on [a] daily basis," but he was otherwise "doing well and stable." Tr. 1115. In an examination of his lungs, Plaintiff appeared to have "decreased breathing sounds to auscultation with no wheezing or rhonchi." *Id.* Plaintiff was again advised to quit smoking and continue on Spiriva. *Id.*

The ALJ also accounted for additional limitations due to his obesity, noting that "in June 2017, he had a recorded weight of approximately 210 pounds, and a height of 5'7", giving him a Body Mass Index (BMI) of 33.01," and a June 2018 reduced BMI of 31.59. Tr. 15, 864, 1723. The ALJ noted that although treatment for obesity was "conservatively limited to casual

suggestions about weight loss, rather than a formally prescribed obesity treatment plan," it was "a severe condition that support[ed] the reduction in the [Plaintiff's] residual functional capacity to a light level of exertional demand" with additional limitations. Tr. 16.

Lastly, the ALJ considered the Physical Residual Functional Capacity Assessment submitted by non-examining agency consultant, Dr. Fredric Simowitz, M.D. Tr. 21-22, 171-174, 185-87. Dr. Simowitz opined Plaintiff could occasionally lift and/or carry up to 20 pounds; frequently lift and/or carry up to 10 pounds; stand and/or walk with normal breaks for a total of about 6 hours in an 8-hour workday; occasionally climb ramps or stairs; never climb ladders, ropes, or scaffolds, and occasionally stoop. Tr. 171-72. Dr. Simowitz expressed that Plaintiff would be limited in his ability to push and/or pull with his right lower extremities, but had unlimited ability to balance, kneel, crouch, and crawl. *Id.* Dr. Simowitz also opined that Plaintiff should avoid concentrated exposure to vibrations, avoid moderate exposure to fumes, odors, dusts, gases, and poor ventilation, and avoid all exposure to hazards. Tr. 172-73. The ALJ found this Assessment to be "partially persuasive" as to Plaintiff's ability to perform light exertional work because it was "consistent with physical examinations that reveal[ed] normal gait, normal muscle bulk and tone, 5/5 strength, diminished vibratory sensation, pain with range of motion, [and] reduced range of motion" and "supported by the [Plaintiff's] testimony that his arthritis flares have improved since beginning Enbrel." Tr. 21. The ALJ found the portion of Dr. Simowitz's opinion that Plaintiff could occasionally climb ramps and stairs, occasionally stoop, never climb ladders, ropes, and scaffolds, and perform all other postural maneuvers without limitation to be unpersuasive. Tr. 22.

Plaintiff argues the ALJ erred in determining he has the RFC to perform light work because he is "unable to do a job that requires any amount of continuous standing" and "cannot

17

grasp things and frequently drops things." ECF No. 23, at 13-14. In presenting this specific

argument, Plaintiff fails to point to any medical evidence in the administrative record to support

a conclusion contrary to the ALJ's RFC determination.

The ALJ explicitly considered Plaintiff's issues with his hands in determining the RFC

and consequently limited him to "light work with occasional postural maneuvers, occasional

handling, fingering, and feeling, and occasional push and pull with the right lower extremity[.]"

Tr. 20. Despite Plaintiff's hearing testimony that he has issues "dropping things" all of the time,

substantial medical evidence supports the ALJ's RFC determination. For example, on May 7,

2017, despite complaining of discomfort with finger motion, a physical examination revealed a

lack of pain with passive range of motion of the fingers and no swelling in the fingers

themselves. Tr. 618, 621. As the ALJ noted, Plaintiff reported improvement after his carpel

tunnel release surgery despite waking up in the morning with sticky finger. Tr. 17, 45-46.

Medical evidence from June 12, 2017 and October 5, 2018 indicated Plaintiff's "grip strength

[was] 4/5 on the left" and "5/5 on the right." An August 7, 2018, range of motion examination

revealed 5/5 "finger squeeze" in both hands as well as Plaintiff's ability to make a fist and pick

up a coin with either hand without difficulty. Tr. 854, 1029, 1507.

Furthermore, the ALJ considered Plaintiff's testimony that he could not stand for more

than five minutes before experiencing neuropathy. Tr. 17, 57. The ALJ found Plaintiff's

medically determinable impairments could reasonably be expected to cause his alleged

symptoms; however, Plaintiff's "statements concerning the intensity, persistence and limiting

effects of these symptoms are not entirely consistent with the medical evidence and other

evidence in the record." Tr. 17.

The ALJ supported the RFC determination with substantial medical evidence related to his impairments. Tr. 18-19. In forming the RFC, the ALJ limited his occasional exposure to hazards with an additional preclusion from climbing ladders, ropes, and scaffolds. Tr. 19. The ALJ found Plaintiff's conditions to have improved after September 2016 when he self-reported less pain and swelling due to a medication change, normal range of motion examination findings, and relief with steroid injections. Tr. 18, 1121, 1693, 1694. The ALJ cited a September 26, 2017 follow up appointment evidencing overall improvement, decreased flare ups, and a physical exam revealing only "mild" shoulder and knee pain with "no significant synovitis, [and] good range of motion in all joints." Tr. 18, 1142-43. The ALJ considered an August 7, 2017 consultative examination with Dr. Barry Burchett, M.D., who observed that Plaintiff ambulated with a normal gait without the use of an ambulation device; appeared stable and comfortable in the supine and sitting positions; no tenderness or swelling in the lower extremities, including the knees, ankles, feet, and calves; no deformities of any joints, and no acute inflammation in any joints other than the right foot. Tr. 18-19, 1025-30. An October 23, 2017 musculoskeletal examination found "normal range of motion, normal strength, [and] no swelling." Tr. 19, 1151. A February 5, 2018 examination exhibited "normal range of motion, normal strength, [and] mild synovitis/tenderness in the [left] knee." Tr. 1161. On March 19, 2018, Plaintiff confirmed the steroid injections provided "good symptomatic relief," and his condition was described as "stable." Tr. 1167. Moreover, the record reveals he was able to ambulate without any assistive devices.

Plaintiff's argument does not point to any medical findings in the treatment notes that demonstrate his impairments caused more limitations than those found by the ALJ. The only record Plaintiff cites in support is a May 5, 2017 neurosurgical consultation with Dr. Ray which

indicates he has "mild low back and neck symptoms," but Plaintiff stated those were not significant to him. ECF No. 23, at 10, 13, 31; Tr. 737. Plaintiff reasons that Dr. Ray's treatment note shows he is not employable because although he had neck and back pain "it was not even important to him because of the overwhelming difficulties he was having with other parts of his body." *Id.* at 13. Plaintiff does not cite to any case law supporting the unique argument that if a plaintiff is unconcerned with pain in one part of the body because of more severe pain in another part of the body, the ALJ must necessarily determine he is unemployable.

"As is true in many disability cases, there is no doubt that [Plaintiff] is experiencing pain." *Perkins v. Astrue*, 648 F.3d 892, 901 (8th Cir. 2011). "While pain may be disabling if it precludes a claimant from engaging in any form of substantial gainful activity, the mere fact that working may cause pain or discomfort does not mandate a finding of disability." *Perkins*, 648 F.3d at 900. As summarized in detail above, the ALJ acknowledged that Plaintiff suffered from pain and symptoms attributable to his conditions of carpal tunnel syndrome, rheumatoid arthritis, and neuropathy; however, Plaintiff has not demonstrated that such symptoms preclude him from performing a limited range of light work.

Plaintiff also argues the ALJ erred by failing to take into consideration his past earnings showing he made $59,710 in 2011, $29,504 in 2012, and $42,905 in 2013. Plaintiff reasons that the "only sensible answer" for why he stopped working was because "he could not do it anymore." ECF No. 23, at 12. In evaluating subjective complaints, the ALJ must consider the factors set forth in *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), "the claimant's prior work history; daily activities; duration, frequency, and intensity of pain; dosage, effectiveness and side effects of medication; precipitating and aggravating factors; and functional restrictions." *Halverson v. Astrue*, 600 F.3d 922, 931 (8th Cir. 2010) (citing *Medhaug v. Astrue*,

578 F.3d 805, 816 (8th Cir. 2009)). While it is true the record here supports Plaintiff's good work history, the ALJ explicitly stated in her opinion that she gave "[c]onsideration to all evidence presented related to the [Plaintiff's] prior work record[.]" Tr. 17. The ALJ identified Plaintiff's past work as a truck driver and mechanic and found he performed such jobs "long enough for the [Plaintiff] to achieve average performance." Tr. 22. Contrary to Plaintiff's argument, "[a] good work history . . . does not negate any other credibility findings that may be made by the ALJ[,]" such as a consideration of a plaintiff's "daily activities, the limited findings on examination, and the lack of any functional limitations by examining physicians." *Moore v. Saul*, No. 1:19-CV-109 ACL, 2020 WL 5632454, at *7 (E.D. Mo. Sept. 21, 2020).

Although the ALJ did not discuss Plaintiff's exact earning amounts within his determination, Plaintiff does not cite to any case law to support such a requirement, and the Court cannot find any authority for that proposition. Even if the ALJ should have discussed Plaintiff's past earnings, at most, it would be a harmless error. *See Byes v. Astrue*, 687 F.3d 913, 917 (8th Cir. 2012) (to show that an error was not harmless, a claimant must provide some indication that the ALJ would have decided the case differently if the error had not occurred). Plaintiff makes no effort to show how a consideration of Plaintiff's salary history from 2011 to 2013 would have caused a different disability determination.

Plaintiff also appears to argue that the ALJ should have found him unable to perform light work due to the side effects of his rheumatoid arthritis medication, Methotrexate. The Court finds no merit in this argument. The ALJ explicitly acknowledged Plaintiff was prescribed Methotrexate, and it caused him "intractable nausea." Tr. 17-18. The ALJ noted that due to Plaintiff's reported side effects, his treating physician discontinued Methotrexate in September of 2016. *Id.* Notably, Methotrexate was discontinued approximately four months after his alleged

amended onset date of May 15, 2016, and there is no indication in the medical record that Plaintiff was re-prescribed Methotrexate from the date it was discontinued up to May 2, 2019, the date of the ALJ's opinion. *See, e.g.,* Tr. 594, 612, 637, 642, 651, 1703 (treatment notes describe Methotrexate as an allergen after discontinuance).

The ALJ considered Plaintiff's hearing testimony in which he described a "big improvement" after he switched from Methotrexate to Enbrel. Tr. 17, 42-44. The ALJ cited to numerous treatment records reflecting improved and intermittent symptoms with conservative treatment, relief with steroid injections, and decreased flare ups. Tr. 18. *See, e.g.*, Tr. 716 ("[h]e said that he has felt better since he stopped the [M]ethotrexate"), 719 ("feeling better with less pain and swelling" after switching to Arava), 847 ("joint symptoms well controlled"), 1121 ("steroid shots in joints during flare ups [] helps"), 1134 (Plaintiff "[r]eports improvement, but has on/off pain"), 1145 (no decreased range of motion"), 1167 (steroid injection provides "good systematic relief" and described rheumatoid arthritis as "stable"), 1699 ("right knee has gotten better after injections"). Moreover, there are numerous physical and musculoskeletal examinations in the record reflecting a normal gait, normal tone and muscle strength, intact reflexes, normal joint range of motion, and no significant inflammation. Tr. 18-19, 597, 601, 615, 621, 629, 631, 639, 651, 714, 717, 723, 726, 730, 849, 854, 927, 1128, 1138, 1143, 1147, 1151, 1156, 1166, 1171, 1236, 1461, 1480, 1688, 1700, 1717.

"Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Hensley*, 829 F.3d 926, 932 (8th Cir. 2016) (quoting *Cox*, 495 F.3d at 619). In this case, the ALJ cited to a significant amount of medical evidence to support the RFC determination, and

the Court concludes substantial evidence in the record as a whole supports the ALJ's determination.

Although the Court recognizes the record does contain treatment notes documenting times where Plaintiff reported more severe pain, inflammation, and reduced range of motion, it cannot remand simply because it "would have reached a different conclusion than the ALJ or because substantial evidence supports a contrary conclusion." *Igo v. Colvin*, 839 F.3d 724, 728 (8th Cir. 2016) (citing *Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014)); *see also Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005) ("If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision."). This Court's review is limited to determining whether the ALJ's findings are based on correct legal standards and supported by substantial evidence. It does not substitute its own judgment for that of the ALJ. *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010) (citing *England v. Astrue*, 490 F.3d 1017, 1019 (8th Cir. 2007)). Having found that substantial evidence supports the ALJ's conclusions and that the ALJ correctly applied the legal standards, this Court affirms the ALJ's decision.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**, and Plaintiff Barry W. Roper's Complaint is **DISMISSED, with prejudice**. A separate judgment will accompany this Memorandum and Order.

So Ordered this 16th day of June, 2021.

*/s/ Stephen R. Welby*
STEPHEN R. WELBY
UNITED STATES MAGISTRATE JUDGE

23